## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

DAVID BLANCH                                      :
                                                  :
                                                  :
    v.                         :     Civil No. CCB-12-1965
                                                  :
                                                  :
CHUBB & SONS, INC.                                :
                                                  :

## MEMORANDUM

David Blanch sues his former employer, Chubb & Sons, Inc. ("Chubb"), for a host of unpaid benefits following his termination from that firm in early 2011.  In a series of prior orders, the court disposed of Blanch's claims for an unpaid performance bonus, profit sharing, and retirement savings plan contributions.  Blanch now moves for reconsideration of this court's prior order granting Chubb summary judgment on his claims for an unpaid performance bonus and profit sharing under the Maryland Wage Payment and Collection Law.  And both parties move for summary judgment on his claims for unpaid severance benefits, while Chubb also seeks summary judgment on Blanch's claims for statutory penalties and breach of an implied contract.  Those motions have been fully briefed, and no hearing is necessary to their resolution. *See* Local Rule 105.6 (D. Md. 2014).  For the reasons explained below, the court will grant Blanch's motion to reconsider; it will grant Chubb's motion for summary judgment on Blanch's claims related to severance benefits and statutory penalties under ERISA, as well as breach of an implied contract; and it will deny Blanch's cross motion for summary judgment on those same claims.

**BACKGROUND**

Blanch lives in Maryland.  (*See* Second Am. Compl. ¶ 1, ECF No. 36; Answer to Second Am. Compl. ¶ 1, ECF No. 38.)  Beginning in late 1999, he worked as an insurance adjuster for Chubb, reporting to its Baltimore office.  (*See* Second Am. Compl. ¶¶ 4, 7.)  On February 16, 2011, however, Chubb terminated Blanch.  (*See* Blanch Cross-Mot. Summ. J. Ex. 2, Blanch Aff. ¶ 3, ECF No. 48-2.)  Over the telephone, Chubb's Regional Human Resources Manager, Jeffrey Moyer, informed Blanch that he would not receive severance benefits because the termination was, in Blanch's words, "for cause of an undisclosed policy violation."  (*Id.* at ¶ 5.)  Roughly two months after Blanch's termination, his attorney sent Moyer a demand letter, disclosing that Blanch had filed a complaint with the Equal Employment Opportunity Commission ("EEOC") and requesting 24 weeks of severance pay with health benefits, as well as other consideration, to settle that complaint.  (*See* Chubb Mot. Summ. J. Ex. 1, First Demand Letter 4/14/2011, ECF No. 47-1.)  Nearly 30 months after that initial letter, Blanch's lawyer reiterated his demand for severance benefits, this time addressing Blanch's request to Chubb's Employee Benefits Committee ("the Committee").  (*See* Chubb Mot. Summ. J. Ex. 2, Second Demand Letter 10/14/2013, ECF No. 47-2.)  Under Chubb's severance plan, the Committee is endowed with discretion to administer the plan.  (*See* Chubb Mot. Summ. J. Ex. 7, Severance Plan Arts. 1.4, 4.1, ECF No. 47-7.)  That second letter also requested "copies of the relevant plan documents . . . , including those that contain all applicable information regarding rights to file a claim for benefits and appeals of benefit denials as well as to whom and where to direct applicable requests."  (Second Demand Letter 10/14/2013.)

The Committee responded to that second demand letter roughly one month later, stating

that it would treat Blanch's demand as a claim for benefits under the severance plan, a copy of which it attached to its response.  (*See* Chubb Mot. Summ. J. Ex. 3, Chubb Acknowledgment Letter 11/8/13, ECF No. 47-3.)  Early the following year, the Committee again wrote Blanch's counsel, informing him that it had denied the claim.  (*See* Chubb Mot. Summ. J. Ex. 4, First Denial Letter 1/9/14, ECF No. 47-4.)  The Committee explained that Blanch's termination "was for 'Cause' (as defined in the Severance Plan) on account of his violation of Chubb's policies, including The Chubb Corporation Code of Business Conduct . . . ."  (*Id.* at 2.)  Under those circumstances, the plan precluded the award of severance benefits.  (*Id.*)

Blanch appealed the Committee's decision.  (*See* Chubb Mot. Summ. J. Ex. 5, Appeal Letter 3/7/14, ECF No. 47-5.)  On appeal, the Committee again refused to award Blanch benefits, reiterating that Blanch had been terminated for cause in violation of Chubb's Code of Business Conduct.  (*See* Chubb Mot. Summ. J. Ex. 6, Second Denial Letter 5/5/14, ECF No. 47-6.)  For additional details, the Committee incorporated by reference a letter Chubb had previously written to the EEOC in response to Blanch's complaint  before that agency.  (*Id.*)  That letter, in turn, stated that Blanch was terminated on the basis of his approval of "several inflated estimates by two contractors from whom he accepted gifts and entertainment."  (Second Denial Letter 5/5/14 Ex. A, EEOC Response Letter 4/18/11 at 1, ECF No. 47-6.)  It indicated that Chubb's Code of Business Conduct forbid employees "from accepting certain gifts and entertainment," which it defined to include "meals, beverages, recreation, lodging, transportation, tickets, charitable and sporting events, parties, play[s], and concerts."  (*Id.* at 2.)[1]

---

[1] A supplement to that document warns employees that "[c]orrupt relationships generally develop incrementally," as acceptance of "small favors . . . grows over time into participation in fraud schemes.  Many of the 'gray 'areas that you face day-to-day may seem innocuous enough when viewed in isolation.  However, a series of 'gray' situations and decisions can cloud one's judgment and eventually lead to unequivocal violations of the Code." (*Id.* at 3.)

Specifically, Chubb indicated that its investigators had obtained evidence that Blanch had accepted from two contractors—C&C Restorations and Minkoff—certain "gifts and entertainment," including beer and sandwiches, a dinner at Morton's, and as many as six lunches. (*Id.* at 5.)  Meanwhile, Chubb's investigators re-inspected several claims that C&C and Minkoff had worked on and that Blanch had assessed, finding that Blanch had approved inflated assessments of those claims' value.  (*See id.* at 5–7.)  In at least one of those instances, Blanch solicited an inflated estimate for the purpose of generating an assessment that would justify settling the claim on the basis of the insured's demand, asking Minkoff to increase its initial estimate by roughly $100,000 without documenting that request, or the facts that might have supported it, in his claims notes.  (*See id.* at 7.)

Blanch initially sued Chubb in the Circuit Court for Baltimore City in June 2012, well before submitting his demand letter to the Committee.  (*See* Compl., ECF No. 2.)  He alleged breach of an implied contract and the covenant of good faith and fair dealings, abusive discharge, unpaid wages under the Maryland Wage Payment and Collection Law ("MWPCL"), and a count he styled "quantum meruit."  (*See id.*)  Chubb removed the complaint to this court, (*see* Notice of Removal, ECF No. 1), and filed a motion to dismiss, (*see* Mot. Dismiss, ECF No. 7), which this court granted with leave to amend Blanch's implied contract, MWPCL, and quantum meruit claims, (*see* Order, ECF No. 11).  Blanch filed an amended complaint, alleging each of those three claims on the ground that Chubb had wrongfully withheld his performance bonus, profit sharing payment, retirement savings plan contributions, and severance benefits.  (*See* Am. Compl., ECF No. 12.)  The court subsequently granted Chubb summary judgment to the extent Blanch's claims were premised on an unpaid bonus or profit sharing, dismissed as moot his

claims for unpaid retirement contributions, and permitted him to file a second amended

complaint as to his severance plan claims, on the ground that he had exhausted administrative

remedies during the pendency of this litigation and now could assert those claims under the

Employee Retirement Income Security Act ("ERISA").  (*See* Order, ECF No. 35; *see also* Mem.

1 n.1, ECF No. 34.)

Blanch amended his complaint.  (*See* ECF No. 36.)  These motions followed.

## ANALYSIS

### I. Motion to Reconsider

Blanch asks this court to reconsider its rejection of his claim for unpaid wages under the

MWPCL in light of the Maryland Court of Appeals' recent interpretation of that statute.  Federal

Rule of Civil Procedure 54(b) governs a motion to reconsider an interlocutory order.[2]  Although

the Fourth Circuit has not identified the precise standard for resolving such a motion, courts

often apply the standards applicable to motions under Rules 59(e) or 60(b).  *See Nana-Akua*

*Takyiwaa Shalom v. Payless Shoesource Worldwide, Inc.*, 921 F. Supp. 2d 470, 480 (D. Md.

2013).

> Most courts have adhered to a fairly narrow set of grounds on which to reconsider
> their interlocutory orders and opinions.  Courts will reconsider an interlocutory
> order in the following situations: (1) there has been an intervening change in
> controlling law; (2) there is additional evidence that was not previously available;
> or (3) the prior decision was based on clear error or would work manifest
> injustice.

*Id.* at 480–81 (quoting *Akeva, LLC v. Adidas Am., Inc.*, 385 F. Supp. 2d 559, 565–66 (M.D.N.C.

---

[2] Blanch indicates that Federal Rule of Civil Procedure 59(e) should govern his motion, (*see* Mot. for
Reconsideration 1, ECF No. 50), which Chubb does not contest.  But "[t]he Fourth Circuit has made clear that
where, as here, the entry of *partial* summary judgment fails to resolve all claims in a suit, Rule 54([b])—not Rule
59(e) or 60(b)—governs a motion for reconsideration."  *Netscape Commc'ns Corp. v. ValueClick, Inc.*, 704 F. Supp.
2d 544, 546 (E.D. Va. 2010) (citing *Am. Canoe Ass'n v. Murphy Farms, Inc.*, 326 F.3d 505, 514–15 (4th Cir.
2003)).  Because the standards under Rule 54(b) and 59(e) are similar, as explained in the body of this
memorandum, the parties' oversight is immaterial.

2005)). Unlike Rules 59(e) or 60(b), however, a party seeking reconsideration under Rule 54(b) need not show "extraordinary circumstances" to win reconsideration. *Netscape Commc'ns*, 704 F. Supp. 2d at 547.

As explained below, the court will grant Blanch's motion on the basis of an intervening change in the law. And it rejects on both procedural and substantive grounds Chubb's alternative bases for dismissing Blanch's claims for an unpaid performance bonus and profit sharing under the MWPCL.

### A. Intervening Change in Maryland Law

Blanch asserts that this court's previous decision contradicts the choice-of-law principles recognized in *Cunningham v. Feinberg*, 107 A.3d 1194 (Md. 2015), which issued several months after this court granted summary judgment to Chubb on Blanch's profit-sharing and annual-incentive claims under the MWPCL. As the initial memorandum on those claims noted, a federal court exercising its diversity jurisdiction must apply the choice-of-law rules of the state in which it sits. *See Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941). Maryland courts have "long recognized the ability of contracting parties to specify in their contract that the laws of a particular State will apply in any dispute over the validity, construction, or enforceability of the contract, and thereby trump the conflict of law rules that otherwise would be applied by the court." *Jackson v. Pasadena Receivables, Inc.*, 921 A.2d 799, 803 (Md. 2007). Among other exceptions, however, that general rule does not apply where the "the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue and which . . . would be the state of the applicable law in the absence of an effective choice of law by the parties." *Id.* at

804 (quoting Restatement (Second) of Conflict of Laws § 187(2)(b)).  In its previous decision, this court recognized that Blanch's claims might be viable under Maryland law, but neither party—then or now—disputed that the plans provided "the kind of incentive-based payments not included under New Jersey wage payment law."  (Mem. 4 n.5, ECF No. 34.)  Chubb's profit-sharing plan and its annual-incentive plan both specify that they are governed by New Jersey law.  Because the court concluded that the MWPCL did not express fundamental Maryland policy, it deferred to the choice-of-law provisions in those plans and granted summary judgment to Chubb on Blanch's claims.

*Cunningham* now undermines that conclusion.  There, in what the Court of Appeals described as "a nifty bit of considered dicta," that court opined that "the MWPCL represents a strong public policy of Maryland."  107 A.3d at 1201.  Although not necessary to resolution of the case, the court was "moved to comment (at some length) on [the importance of the MWPCL to Maryland policy] because of how federal courts have examined and reached conclusions regarding this quintessentially state law question."  *Id.* at 1211.  Specifically, the court highlighted cases—including this court's previous adjudication of Blanch's claims—"in which federal judges, applying [Maryland] conflict of law principles, found that a private right of action under the MWPCL was not available to employees claiming unpaid wages under contracts entered outside of Maryland," on the ground that those statutory protections do not "reflect[] strong public policy of Maryland."  *Id.* at 1214.  *Cunningham*, by contrast, "encourage[d] a future Maryland Court to hold (in light of the considered dicta expressed here) that the MWPCL represents strong Maryland public policy" for the purpose of conflict-of-law analysis.  *Id.* at 1215.

*Cunningham* largely premised that "encourage[ment]" on a 2011 amendment to the

MWPCL, which declared void "[a]n agreement to work for less than the wage required under

this subtitle."  2011 Md. Laws Ch. 118 § 1 (codified at Md. Code Ann., Lab. & Empl. § 3-

502(f)).  That amendment codified the Court of Appeals' previous interpretation of the MWPCL.

*See Medex v. McCabe*, 811 A.2d 297, 304 (Md. 2002) ("Contractual language between the

parties cannot be used to eliminate the requirement and public policy that employees have a right

to be compensated for their efforts.").  And it underlined Maryland's general willingness "to

allow itself to be used as a forum by workers seeking recovery of their wage claims."

*Cunningham*, 107 A.3d at 1218.  Reading the legislative history of the amendment against that

backdrop, *Cunningham* suggested that the anti-waiver provision clarified Maryland law without

substantively altering it.  *See id.* at 1217–18.

Chubb responds that "*Cunningham* is admittedly dicta, and as such does not in any way

alter the law of the State of Maryland."  (Opp. Mot. Reconsider 2.)  That observation is accurate

but not determinative.  In applying the law of Maryland, this court has

> an obligation to interpret the law in accordance with the Court of Appeal of
> Maryland, or where the law is unclear, as it appears that the Court of Appeals
> would rule.  To forecast a decision of the state's highest court [federal courts]
> may consider, *inter alia*: canons of construction, restatements of the law, treatises,
> recent pronouncements of general rules or policies by the state's highest court,
> *well considered dicta*, and the state's trial court decisions.

*Wells v. Liddy*, 186 F.3d 505, 527–28 (4th Cir. 1999) (internal citations omitted) (emphasis

added).  The dicta of the Court of Appeals is especially probative, insofar as "[c]onsidered dicta

in the opinions of the highest state court should not be ignored; and dictum which is a clear

exposition of the law must be followed unless in conflict with other decisions of that court."

*Sherby v. Weather Bros. Transfer Co.*, 421 F.2d 1243, 1244 (4th Cir. 1970); *cf. Lee-Thomas v.*

*Prince George's Cnty. Pub. Schs.*, 666 F.3d 244, 254 n.10 (4th Cir. 2012) (reaffirming this rule

in the context of the Court of Appeals' discussion of Maryland sovereign immunity).  Because

the Court of Appeals had never before considered the strength of the policy expressed in the

MWPCL, this court is bound by *Cunningham*'s "clear exposition of the law."

By the same token, *Cunningham*'s considered dicta overrides the Fourth Circuit's prior

holding that "the MWPCL is not a fundamental Maryland public policy" for the purposes of

Maryland choice-of-law analysis.  *Kunda v. C.R. Bard, Inc.*, 671 F.3d 464, 468 (4th Cir. 2011).[3]

Typically, the Fourth Circuit's prediction as to how a state's highest court would resolve a

particular issue "is binding on district courts in this circuit . . . ."  *Rutherford v. Columbia Gas*,

575 F.3d 616, 619 (6th Cir. 2009) (quoting *Wankier v. Crown Equip. Corp.*, 353 F.3d 862, 866

(10th Cir. 2003)).  That general rule does not apply, however, where "an intervening decision of

the state's highest court has resolved the issue."  *Id.*  Applying the exception for intervening

decisions is especially appropriate in light of the Maryland Court of Appeals' express criticism

of the Fourth Circuit's reasoning in *Kunda*.  Specifically, *Cunningham* noted that *Kunda* had

ignored the 2011 amendment incorporating an anti-waiver provision into the MWPCL, which the

General Assembly passed just before *Kunda* issued.  *See Cunningham*, 107 A.3d at 1215.

"Perhaps the Fourth Circuit was unaware of this change," *Cunningham* speculated; "perhaps

[that court] determined not to assign to the change much weight."  *Id.*  In addition, the Maryland

Court of Appeals highlighted *Kunda*'s refusal to ascribe significance to "the language in *Medex*

suggesting the importance of the policy embodied in the MWPCL," which long predated passage

---

[3] When *Kunda* issued, "[n]o Maryland state court ha[d] yet evaluated whether the MWPCL embodies . . . a strong public policy."  *Kunda*, 671 F.3d at 468 (quoting *Sedghi v. Patchlink Corp.*, Civ. No. JFM-07-1636, 2010 WL 3895472, at *4 (D. Md. Sept. 30, 2010)).

of the MWPCL in 2011.  *Id.* at 1216.[4]

Chubb next highlights *Cunningham*'s reliance on the 2011 amendment to the MWPCL, arguing it cannot apply retroactively to this case.  Under Chubb's theory, the MWPCL was not elevated to fundamental Maryland policy until that amendment's effective date in late 2011, long after Chubb had promulgated its profit-sharing and incentive-pay plans and months after it had terminated Blanch.  Because the 2011 amendment merely clarified Maryland law without substantively altering it, however, Chubb's retroactivity argument fails.

Where the legislature codifies an existing judicial interpretation for the sake of clarity, it has not substantively changed the law.  *See Russell v. Gaither*, 952 A.2d 1013, 1018 (Md. Ct. Spec. App. 2008) ("[A] nonsubstantive codification . . . ordinarily works no change in existing law . . . .").  It follows that where an amendment merely "clarified the meaning [of a statute] as it existed before th[at] amendment[]," enforcing that meaning does not amount to applying the amendment retroactively.  *Brown v. Thompson*, 374 F.3d 253, 261 n.6 (4th Cir. 2004).  That is what happened here.

As noted, the 2011 amendment codified the holding of *Medex*, which had implied nearly a decade earlier that the protections of the MWPCL could not be waived notwithstanding the absence of an express anti-waiver provision in the statute.  *See* 811 A.2d at 304 & n.4 (recognizing that analogous laws in other states expressly prohibited waiver).  Because "the General Assembly legislates in the light of prior judicial construction of legislation then subject

---

[4] *Kunda* recognized the potential importance of that language, but ultimately disregarded it.  *Medex*, the Fourth Circuit reasoned, "refused to uphold a provision in an employment contract between a Maryland company and Maryland resident requiring continued employment to receive already earned incentive payments . . . . Since the contract was between a Maryland employer and a Maryland employee, the question of whether the contract was enforceable in *Medex* depended upon whether the provision in question was contrary to Maryland public policy." *Kunda*, 671 F.3d at 468–69.  Nevertheless, *Kunda* reasoned that *Medex* did not evaluate whether the contract violated "a *fundamental* Maryland public policy . . . . The *Medex* court neither indicated how strong the public policy behind the MWPCL is nor attempted to determine whether the policy was fundamental." *Id.* at 469.

to legislative consideration," *Macke Co. v. State Dep't of Assessments & Taxation*, 285 A.2d

593, 599 (Md. 1972), it is presumed to have known of *Medex* and affirmed that case's prior

construction of the MWPCL.  Indeed, *Cunningham* itself recognized the clarifying character of

the 2011 amendment.  Reviewing the legislative history of that enactment, the Court of Appeals

noted that both the Fiscal and Policy Note of the bill and the testimony of one of the bill's

sponsor described the purpose of the amendment as clarifying the substance of Maryland law,

not altering it.  *Cunningham*, 107 A.3d at 1217.[5]

    If the 2011 amendment had any effect, it was only to confirm the MWCPL's significance

to Maryland policy for the purpose of choice-of-law analysis.  That confirmation, however, did

not alter Maryland policy.  "While amendments are not controlling as to the meaning of prior

iteration[s] of the same statutory scheme," *Cunningham* observed, "'nevertheless, subsequent

legislation can be considered helpful to determine legislative intent.'"  107 A.3d at 1217 (quoting

*Johnson v. Mayor & City Council of Balt.*, 61 A.3d 33, 45 (Md. 2013)); *accord, e.g.*, *Nesbit v.*

*Gov't Emps. Ins. Co.*, 854 A.2d 879, 886–87 (Md. 2004).  In this sense, "[s]tatutes may be

passed purely to make what was intended all along even more unmistakably clear."  *Brown*, 374

F.3d at 259.

    Indeed, for choice-of-law purposes, the Court of Appeals has often assessed the

significance of a state policy by reference to statutory amendments postdating the parties'

dispute.  In *National Glass, Inc. v. J.C. Penney Properties, Inc.*, 650 A.2d 246 (Md. 1994), the

Court of Appeals held that a Maryland statute codified fundamental policy on the basis, in part,

---

[5] *Cunningham* also drew on the Court of Appeals' interpretation of Maryland's worker's compensation statutes, which "reflect a pointed willingness by Maryland to allow itself to be a forum where the rights of employees may be vindicated to the fullest extent possible . . . ."  107 A.3d at 1218.  Although the court acknowledged that workers' compensation provisions must "be considered separately" from the state's wage and hours laws, it also emphasized "some affinity" between those statutes, and observed that "statutes on the same subject are to be read together and harmonized to the extent possible . . . ."  *Id.* (quoting *Whiting-Turner Contracting Co. v. Fitzpatrick*, 783 A.2d 667, 671 (Md. 2001)).

of an amendment passed during the pendency of the litigation.  At the time of that dispute, the statute declared void contractual provisions that waived the right to claim a mechanic's lien.  *Id.* at 614.  As the dispute made its way through the courts, the General Assembly amended the statute to clarify that such contractual provisions were "void as against the public policy of this State."  *Id.* (quoting Md. Code Ann., Real Prop. § 9-113(c)).  *National Glass* observed that the amendment "is not a substantive change, but is merely a clarification as to why a provision waiving the right to claim a mechanic's lien is void and unenforceable," and relied in part on that clarification to hold that the statute described fundamental state policy.  *Id.* at 614–15.

In *Kronovet v. Lipchin*, 415 A.2d 1096 (Md. 1980), the Court of Appeals adopted a similar interpretive approach.  There, the parties negotiated in New York a note secured by a deed of trust, which specified that Maryland law would govern the note's rate of interest.  *See id.* at 1099, 1106–07.  The Court of Appeals honored that choice-of-law provision, holding that a New York statute capping the maximum possible interest on such a note did not constitute the fundamental policy of that state, in part because the legislature amended that statute to remove the cap long after the parties had executed their contract.  *Id.* at 1106, 1109.  In both *National Glass* and *Kronovet*, then, the Court of Appeals assessed the significance of a state's policy by evaluating subsequent statutory amendments.  Adopting that same approach here suggests that the 2011 amendment merely confirmed the longstanding significance of the MWPCL to Maryland policy.

Last, Chubb asserts that New Jersey, where the company is headquartered, has "a materially greater interest . . . in the application of Chubb's two plans" than any interest Maryland might have in the enforcement of its fundamental policy.  (Opp. Mot. to Reconsider 3.)

"When it comes to complex fringe benefits plans," Chubb argues, "a multi-state employer, and by extension, its home state, have a strong interest in establishing a uniform legal framework for the plans' administration." (*Id.*) In the context of the ERISA, for example, the *federal* interest in uniformity is expressed by a robust preemption provision, which precludes application of certain inconsistent state laws. *See, e.g.*, *Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41, 55 (1987). But that *federal* statute expresses the policy of the United States, not New Jersey. And, as Chubb concedes, ERISA does not govern Chubb's profit-sharing or performance-incentive plans.

To the extent Chubb asserts New Jersey's interest in the predictable and uniform administration of its businesses' non-ERISA employee compensation plans, Chubb begs the balancing question without answering it. As the sole case on which Chubb relies explains, "the demands of certainty, predictability and convenience dictate that, *subject to some limitations*, the parties should have power to choose the applicable law." *Jackson*, 921 A.2d at 805 (emphasis added) (quoting Restatement (Second) of Conflict of Laws § 187 cmt. e). Here, the parties contest the applicability of one of those limitations—namely, the exception for certain fundamental state policies—not the otherwise-applicable general rule. In other words, the interest in predictability and uniformity explains why Maryland generally defers to the parties' choice of law, without explaining the policies that inform the exceptions to that rule, let alone how to balance those competing policies. Nor does *Jackson* help to answer that question; it held that the Maryland statute relevant to that dispute did not constitute a fundamental policy, and thus never balanced the competing jurisdictions' interests. *Id.* at 808.

Instead, application of the fundamental policy exception turns on competing states' interests in the substantive policies implicated by the parties' underlying dispute, not on their

interests in enforcing a choice-of-law clause.  For example, in *National Glass*, 650 A.2d at 250–
51, the Court of Appeals evaluated the strength of two competing jurisdictions' interests in a
dispute by evaluating the parties' contacts with the states, as those contacts were pertinent to
Maryland's fundamental policy.  As noted, that case concerned the enforcement of a contractual
provision purporting to waive the right to a mechanic's lien, which Maryland's fundamental
policy forbid.  The Court of Appeals emphasized that the lien applied to "Maryland property for
work performed in Maryland," and that the lien protected "a Maryland corporation which has
furnished services on the property located in Maryland."  *Id.* at 250–51.  The sole interest of the
competing jurisdiction—Pennsylvania—derived from the contractor's incorporation and
residence in that state.  *Id.* at 251.  "[B]ecause Maryland has a strong public policy protecting
subcontractors against contractual provisions waiving the right to claim a mechanic's lien and
because the property on which the Maryland subcontractor seeks to establish a mechanic's lien is
located in Maryland," the Court of Appeals concluded, "it is evident that Maryland's interest in
the determination of the issues in the present case is materially greater than that of
Pennsylvania."  *Id.*

   Here, it is undisputed that Blanch lives in Maryland and worked out of Chubb's offices in
Baltimore.  And the cause of action contained in the MWPCL seeks "to provide a vehicle for
employees to collect, and an incentive for employers to pay, back wages."  *Cunningham*, 107
A.3d at 1202 (quoting *Battaglia v. Clinical Perfusionists, Inc.*, 658 A.2d 680, 686 (Md. 1995)).
By contrast, Chubb has not argued that New Jersey has any fundamental interest in the
underlying substance of the dispute, only that the state has an interest in the uniform
administration of its resident firms' employee benefit plans.  *See Bethlehem Steel Corp. v. G.C.*

*Zarnas & Co.*, 498 A.2d 605, 609 (Md. 1985) (applying a fundamental Maryland policy rather

than Pennsylvania law where "Pennsylvania common law merely tolerate[d]" a particular

contractual provision, without expressing any fundamental preference for it).  Because the law

protects employees and because Blanch worked in Maryland, that state's interest in enforcing its

fundamental policy is greater than New Jersey's interest in the case.  Maryland's law, not New

Jersey's, will apply to Blanch's claims under the MWPCL.

### B. Chubb's Alternative Arguments

In the alternative, Chubb objects that Blanch's MWPCL claim for unpaid profit sharing

fails on two independent grounds even under Maryland law.  Because any payment under

Chubb's profit sharing plan would have been "dependent on conditions other than the

employee's efforts," Chubb argues that those payments do not qualify as wages under the

MWPCL.[6]  And it argues that Blanch's misconduct on the job forfeited any claim to unpaid

compensation.

In its initial motion for summary judgment, however, Chubb did not assert either of these

alternative arguments.  That omission precludes their consideration now in opposition to

Blanch's motion for reconsideration.  *Cf. Tepeyac v. Montgomery Cnty.*, 5 F. Supp. 3d 745, 770

(D. Md. 2014) ("A Rule 59(e) motion may not be used to relitigate old matters, or to raise

arguments or present evidence that could have been raised prior to the entry of judgment."

(internal quotation marks and citation omitted)).  But even were Chubb's arguments procedurally

proper, they would still fail on their merits.

### i. Wages Under the MWPCL

As to its MWCPL argument, that statute "defines the term 'wage' broadly" to include,

---

[6] That argument appears to be pertinent only to his claim for unpaid profit sharing, not to his alleged
entitlement to an outstanding bonus under Chubb's incentive plan.

among other things, "'any . . . remuneration promised for service.'"  *Catalyst Health Solutions v. Magill*, 995 A.2d 960, 969 (Md. 2010) (quoting Md. Code Ann., Lab. & Empl. § 3-501(c)(2)(v)).[7]  In *Whiting-Turner Contracting Co. v. Fitzpatrick*, 783 A.2d 667 (Md. 2001), the Maryland Court of Appeals developed what it later described as a "bright-line test" to apply that definition.  *Catalyst Health*, 995 A.2d at 969.  That test "provides that only when wages have been promised as part of the compensation for the employment arrangement and *all conditions agreed to in advance* for earning those wages have been satisfied" does the MWPCL require payment.  *Id.* (citing *Whiting-Turner*, 783 A.2d at 672–73.)

In *Whiting-Turner*, for example, the Court of Appeals considered whether a profit-sharing bonus constituted a "wage" under the MWPCL.  At the time of the plaintiff's hiring, he and his employer agreed that his compensation "would consist of a weekly bonus and, after two years of employment and depending upon the profitability of the company, profit sharing."  783 A.2d at 669.  Before that two-year period had run, however, the employer offered payment of a profit-sharing bonus, on the condition that the plaintiff remain with the firm.  *Id.*  The plaintiff declined his employer's offer and quit, but nonetheless sued for the unpaid bonus.  The court rejected that claim, reasoning:

> Had the [plaintiff] been with the [employer] for two years when the decision was
> made to offer him a bonus and had the financial condition of the [employer]

---

[7] The full statute provides:

> (1) "Wage" means all compensation that is due to an employee for employment.
> (2) "Wage" includes
>     (i) a bonus;
>     (ii) a commission;
>     (iii) a fringe benefit;
>     (iv) overtime wages; or
>     (v) any other remuneration promised for service.

Md. Code Ann., Lab. & Empl. § 3-501(c).

justified it, *there would be no doubt of the [plaintiff's] entitlement*, that he would
have earned the distribution in this case.  That is so because sharing in the profits
of the company after two years was promised as part of the [plaintiff's]
compensation package.  Here, however, the [employer] decided to give the
[plaintiff] a bonus before he had been employed for two years.  Where such
remuneration is not a part of the compensation package promised, it is merely a
gift, a gratuity, revocable at any time before delivery.

*Id.* at 673 (emphasis added).

One year later, in *Medex v. McCabe*, 811 A.2d at 302, the Court of Appeals confronted

the situation it had anticipated in *Whiting-Turner*, addressing whether "incentive fees . . . related

directly to sales made by the employees during a defined fiscal year" constituted "wages" under

the MWPCL.  Relying on *Whiting-Turner*, *Medex* reasoned that "it is the exchange of

remuneration for the employee's work that is crucial to the determination that compensation

constitutes a wage."  *Id.* (citing *Whiting-Turner*, 783 A.2d at 671).  Because the incentive fees

"were compensation for work performed," the court concluded that they were wages.  *Id.* at 303.

Here, Chubb asserts that payments under its profit-sharing plan do not qualify as wages,

insofar as they are based in part on criteria independent of each employee's performance.

Indeed, the plan specifies that each eligible employee's share of applicable profits is determined

on the basis of criteria "including, but not limited to, *business unit or individual performance*,

job function, length of service and payband."  (Opp. Mot. for Reconsideration Ex. 2, First

Amendment to Profit Sharing Plan, ECF No. 52-2 (emphasis added).)  For support, Chubb

invokes a snippet of *Medex*: "Where the payments [to an employee] are dependent upon

conditions other than the employee's efforts, they lie outside of the definition" of wages under

the MWPCL.  *Medex*, 811 A.2d at 302 (citing *Whiting-Turner*, 783 A.2d at 671–72.)  As the

Maryland Court of Special Appeals later clarified in a careful and persuasive opinion, however,

17

that snippet of prose "merely explains [the Court of Appeals'] holding in *Whiting-Turner*, that payments, which are merely offered as a gratuity, revocable at any time before delivery, and not promised for service, do not qualify as wages under the Wage Law. The *Medex* Court does not require that each dollar received be tied to specific actions by the employee." *Aronson & Co. v. Fetridge*, 957 A.2d 125, 137–38 (Md. Ct. Spec. App. 2008) (internal citation omitted). For that reason, *Aronson* rejected an employer's argument that profit-sharing payments were not "wages" "because they are not directly tied to an employee's efforts . . . ." *Id.* at 136, 138. Indeed, *Whiting-Turner* itself contemplated the possibility "that payments comprising a business' profits can, as a matter of law, constitute a wage," without requiring a direct connection between those profits and the employee's performance. *Id.* at 137.[8]

Accordingly, the possibility that Chubb employees' profit-sharing payments might be based in part on the performance of their business units—and not exclusively on their individual performance—does not carry those payments outside the MWPCL's definition of wages.

### ii. Forfeiture

As to Chubb's remaining argument—that Blanch's misconduct forfeited any entitlement to unpaid wages—may be precluded by factual disputes as to the justification for Blanch's termination. As explained below, the court defers to the Committee's discretionary

---

[8] Chubb also invokes an unpublished decision of this court, which held that certain bonuses were not wages under the MWPCL where those payments were based "on factors other than [the employees'] own efforts." *Makowski v. Bovis Lend Lease, Inc.*, 2011 WL 1045635, Civ. No. RDB-10-1844, 2011 WL 1045635, at *9 (D. Md. Mar. 17, 2011). That decision was premised on the same decontextualized passage from *Medex* on which Chubb now relies, as well as the decisions of courts in New York and Indiana that interpreted those states' wage payment laws. *See id.* at *8–9. Unfortunately, it did not cite the pertinent passage in *Aronson*. Yet "when a federal court sits in diversity, as in the case at hand, it is not free to reject [a] state rule merely because it has not received the sanction of the highest state court.' Rather, when 'an intermediate appellate state court rests its considered judgment upon the rule of law which it announces, that is a datum for ascertaining state law which is not to be disregarded by a federal court unless it is convinced by other persuasive data that the highest court of the state would decide otherwise.'" *C.F. Trust, Inc. v. First Flight LP*, 306 F.3d 126, 137 (4th Cir. 2002) (quoting *West v. AT&T*, 311 U.S. 223, 236, 237 (1940)). The court finds *Aronson*'s interpretation of *Medex* persuasive here.

determination that Blanch's termination for cause deprived him of benefits under Chubb's

severance plan.  *See infra* Part II.  But no such deferential standard applies to Chubb's argument

that the constructive condition of substantial performance relieves it of its obligation to pay him

earned wages.  Chubb relies on *Towson University v. Conte*, which held that "the fact-finding

prerogative remains with the employer" that has terminated an employee protected by a for-

cause employment contract.  862 A.2d 941, 950.  But that same decision also held that "the

proper role of the jury is to review the *objective* motivation, *i.e.*, whether the employer acted in

objective good faith and in accordance with a reasonable employer under similar circumstances

when he decided there was just cause to terminate the employee."  *Id.*  Granting judgment to

Chubb on Blanch's ERISA claim does not appear to answer those questions.  Certainly Chubb

has cited no authority suggesting as much.  Whether Blanch's misconduct was such as to forfeit

his claims under the MWCPL has not been adequately addressed by the parties to permit

granting summary judgment at this time.

*          *          *

In light of *Cunningham*, then, the court concludes that its prior grant of summary

judgment in favor of Chubb on Blanch's claims for an unpaid bonus and profit sharing under the

MWPCL merits reconsideration.  The court will vacate its prior order to the extent it granted

summary judgment on those claims.

## II. Cross-Motions for Summary Judgment

As noted, Blanch filed a second amended complaint seeking benefits under Chubb's

ERISA severance plan, statutory penalties under 29 U.S.C. § 1132(c)(1), and breach of an

implied contract with Chubb.  Chubb has moved for summary judgment on those three claims.

Blanch opposes that motion in part, and also seeks summary judgment on his ERISA claims.  As explained below, Chubb's motion will be granted and Blanch's denied.

## A. Standard of Review

Federal Rule of Civil Procedure 56(a) provides that summary judgment should be granted "if the movant shows that there is no *genuine* dispute as to any *material* fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a) (emphases added).  "A dispute is genuine if 'a reasonable jury could return a verdict for the nonmoving party.'" *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013) (quoting *Dulaney v. Packaging Corp. of Am.*, 673 F.3d 323, 330 (4th Cir. 2012)).  "A fact is material if it 'might affect the outcome of the suit under the governing law.'" *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  Accordingly, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment[.]" *Anderson*, 477 U.S. at 247–48.  The court must view the evidence in the light most favorable to the nonmoving party, *Tolan v. Cotton*, 134 S. Ct. 1861, 1866 (2014) (per curiam), and draw all reasonable inferences in that party's favor, *Scott v. Harris*, 550 U.S. 372, 378 (2007) (citations omitted); *see also Jacobs v. N.C. Admin. Office of the Courts*, 780 F.3d 562, 568-69 (4th Cir. 2015).  At the same time, the court must "prevent factually unsupported claims and defenses from proceeding to trial."  *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 526 (4th Cir. 2003) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778–79 (4th Cir. 2003)).

## B. Claim for Unpaid Severance Benefits

Blanch claims that the Committee administering Chubb's severance plan wrongfully denied him benefits.  The parties do not dispute that ERISA governs that plan.  *See, e.g., Biggers*

*v. Wittek Indus., Inc.*, 4 F.3d 291, 295 (4th Cir. 1993) ("A plan established by an employer

providing for severance pay benefits is an employee welfare benefit plan covered by ERISA.")

"[W]hen 'an ERISA benefit plan vests with the plan administrator the discretionary authority to

make eligibility determinations for beneficiaries, a reviewing court evaluates the plan

administrator's decision for abuse of discretion." *Helton v. AT&T Inc.*, 709 F.3d 343, 351 (4th

Cir. 2013) (quoting *Williams v. Metro. Life Ins. Co.*, 609 F.3d 622, 629–30 (4th Cir. 2010)).

Because Chubb's severance plan expressly endows the Committee that administers that plan with

such discretion, (*see* Severance Plan Art. 4.1), that Committee's denial of severance benefits to

Blanch will be reviewed for abuse of discretion.

      Under the abuse-of-discretion standard, "this Court should affirm a discretionary decision

of a plan administrator if it is the result of a 'deliberate, principled reasoning process' and is

supported by 'substantial evidence,' even if [the court] would reach a different decision

independently." *Helton*, 709 F.3d at 351 (quoting *Williams*, 609 F.3d at 630).  To facilitate that

review, the Fourth Circuit "has identified 'eight nonexclusive factors for courts to consider in

evaluating whether a plan administrator abused its discretion.'" *Harrison v. Wells Fargo Bank,

N.A.*, 773 F.3d 15, 20 (4th Cir. 2014) (quoting *Helton*, 709 F.3d at 353).  Those considerations,

which are known as the *Booth* factors, include:

> the language of the plan; (2) the purposes and goals of the plan; (3) the adequacy
> of the materials considered to make the decision and the degree to which they
> support it; (4) whether the fiduciary's interpretation was consistent with other
> provisions in the plan and with earlier interpretations of the plan; (5) whether the
> decisionmaking process was reasoned and principled; (6) whether the decision
> was consistent with the procedural and substantive requirements of ERISA; (7)
> any external standard relevant to the exercise of discretion; and (8) the fiduciary's
> motives and any conflicts of interest it may have.

*Id.* (quoting *Booth v. Wal-Mart Stores, Inc. Assoc. Health & Welfare Plan*, 201 F.3d 335, 342–43

(4th Cir. 2000).  "All eight *Booth* factors need not be . . . in play in" every case.  *Helton*, 709

F.3d at 357.

Here, substantial evidence supports the Committee's determination that Blanch was not

eligible for benefits under Chubb's severance plan.  That plan precludes the award of severance

benefits to employees discharged for cause.  (*See* Severance Plan Art. 2.1.)  And it defines cause,

in turn, to include the commission of "fraud against the Company," as well as "violation of the

Company's internal policies."  (*See id.* at Art. 1.2.)  The Committee's conclusion that Blanch

was terminated for cause was premised on evidence indicating that he had accepted meals from

contractors from whom he approved (and in one case solicited) inflated estimates of claims.

Blanch first argues that the Committee's initial denial of benefits was impermissibly

conclusory, insofar as it stated that he had been terminated for cause without reviewing the

evidence underlying that determination.  *See* 29 U.S.C. § 1133(1); 29 C.F.R. § 2560.503-

1(g)(1)(i).  For support, Blanch invokes *Weaver v. Phoenix Home Life Mutual Insurance Co.*,

990 F.2d 154, 158 (4th Cir. 1993), which explained that "[a]n ERISA fiduciary must provide the

beneficiary with the *specific reasons* for the denial of benefits."  But the circumstances in

*Weaver* were materially different than those here.  In that case, the insurer "produced no

evidence that it even remotely considered any specific reasons in denying the claim."  *Id.* at 159.

Indeed, the plan administrator "admitted that it d[id] not know the standards by which the

decision to deny the [claimaint's] claim was made."  *Id.* at 160.

Further, Blanch focuses only on the Committee's initial determination that he was

ineligible for benefits, not its final decision.  But it is the final decision that counts.  "To focus

elsewhere would be inconsistent with ERISA's exhaustion requirement."  *Funk v. CIGNA Grp.*

*Ins.*, 648 F.3d 182, 191 n.11 (3d Cir. 2011).  At most, a court might "consider a plan

administrator's pre-final decision as evidence of the decision-making process that yielded the

final decision," perhaps by evaluating inconsistencies between the two decisions, *id.*, or

procedural impediments generated by a conclusory initial determination, *see Kinkead v. Sw. Bell

Corp. Sickness & Accident Disability Benefit Plan*, 111 F. 3d 67, 69 (8th Cir. 1997).

While it could have been more thorough, the Committee's initial denial letter satisfied

ERISA command to "set[] forth the specific reasons for such denial."  29 U.S.C. § 1133(1).  An

administrator need only demonstrate "substantial compliance" with the specificity requirement.

*Brogan v. Holland*, 105 F.3d 158, 165 (4th Cir. 1997).  It need not provide "the reasoning behind

the reasons" for its denial of benefits.  *Gallo v. Amoco Corp.*, 102 F.3d 918, 922 (7th Cir. 1996).

Here, the Committee initially explained that Blanch had been denied benefits because he had

been terminated for cause, rather than some other ground of decision.  That is explanation

enough, notwithstanding the Committee's failure to outline the factual bases for Blanch's for-

cause termination.[9]  And the final explanation for his termination—which extensively outlined

the facts supporting Blanch's termination—is sufficient to permit further review, as ERISA

requires.[10]

Blanch also disagrees on the merits, asserting that the Committee's substantive basis for

denying his claims was not supported by substantial evidence.  Specifically, he claims that his

alleged conduct did not constitute "fraud" as that term is defined in Chubb's Code of Business

---

[9] This is especially true here, because the questions posed to Blanch during Chubb's investigation of his conduct should have made him aware of his employer's concerns.  (*See* EEOC Response Letter 4/18/11 Exs. E–F, ECF No. 47-6.)  Read in light of that experience, Blanch should have known the underlying basis for his for-cause termination.  And he has proffered nothing to dispute the evidence on which that termination decision was based.

[10] Even were it otherwise, the remedy for such a procedural violation of ERISA "is to remand the matter to the plan administrator so that a 'full and fair review' can be accomplished."  *Gagliano v. Reliance Standard Life Ins. Co.*, 547 F.3d 230, 240 (4th Cir. 2008).  But where, as here, remand would be a "useless formality" that would generate the same outcome, courts refuse to waste the parties' money with such a futile remedy, instead entering judgment for the defendant ERISA plan.  *Kent v. United of Omaha Life Ins. Co.*, 96 F.3d 803, 807 (6th Cir. 1996).

Conduct.  Under that policy, "fraud" consists of "the *knowing* practice of deception in order to receive an *unfair or unlawful gain*."  (Second Denial Letter 5/5/14 Ex. A, EEOC Response Letter 4/18/11 Ex. A, Code of Business Conduct 6, ECF No. 47-6 (emphases added).)  Blanch contends that no evidence indicates that his conduct was *knowingly* deceptive or that he derived *impermissible* gains from it.  As to Blanch's state of mind, however, it is acceptable to infer deliberate deception from a pattern of approving inflated estimates.  *Cf. Rosemond v. United States*, 134 S. Ct. 1240, 1250 n.9 (2014) (reaffirming the longstanding rule of criminal law, which employs an elevated standard of proof, that "the factfinder can draw inferences about a defendant's intent based on all the facts and circumstances of a crime's commission").  And, in at least one instance, the Committee considered evidence that Blanch actively *solicited* such an inflated estimate, rather than merely approving it without sufficiently diligent review.  As to the alleged absence of impermissible gains, Blanch emphasizes that Chubb's Code of Business conduct permits the acceptance of "certain unsolicited and occasional gifts, including meals and entertainment, if the value of the gift or entertainment is nominal and in accordance with accepted business practices."  (Code of Business Conduct 5.)  Blanch contends that the meals he received from C&C and Minkoff fall into that exception.  Maybe so.  But whether a gift is nominal and consistent with accepted business practice are factually intensive questions of degree.  Given the character of those questions and the highly deferential standard of review applicable here, the court cannot characterize the Committee's conclusion as unsupported.  Such deference is especially warranted in light of Chubb's warning to its employees that "[c]orrupt relationships generally develop incrementally."  (*See* EEOC Response Letter at 3.)

Last, Blanch asserts that his termination may have violated Chubb's prohibition on

retaliation "against an employee who . . . assists in a company investigation." (Code of Business Conduct 4.) Because he answered the questions of Chubb employees investigating *his* conduct, he now contends that he is immune from discipline under that anti-retaliation policy for any misconduct the investigation revealed. The court would not endorse that interpretation of Chubb's policy even on de novo review, and certainly will not do so under the abuse-of-discretion standard applicable here.

Accordingly, the court will grant summary judgment to Chubb on Blanch's claims that he was improperly denied severance benefits.

### C. Statutory Penalties

Under 29 U.S.C. § 1024(b)(4), an ERISA plan administrator must, "upon written request of any participant or beneficiary, furnish a copy of the latest updated summary, plan description . . . or other instruments under which the plan is established or operated." If a plan administrator fails to honor such a request within 30 days, the administrator "may in the court's discretion be personally liable to such participant or beneficiary in the amount of up to $100 a day from the date of such failure or refusal . . . ." 29 U.S.C. § 1132(c)(1). Blanch seeks such penalties here, on the ground that he requested access to severance plan documents in a letter dated April 14, 2011, but did not receive those document until November 8, 2013. (*See* Second Am. Compl. ¶¶ 53, 56.)

The documentary evidence appended to Chubb's motion for summary judgment contradicts Blanch's allegations. The 2011 letter, on which Blanch relies, demanded severance benefits, but did not request anything like access to severance plan documents, (*see* First Demand Letter), which is enough to defeat his claim, *see Kollman v. Hewitt Assocs., LLC*, 487

F.3d 139, 145 (3d Cir. 2007) (explaining that "plaintiffs seeking documents under 29 U.S.C.

§ 1024(b)(4) must provide clear notice to the plan administrator of the information they desire").

Although a poorly written letter might sometimes qualify as a request for information, *see, e. g.*,

*Boone v. Leavenworth Anesthesia, Inc.*, 20 F.3d 1108, 1111 (10th Cir. 1994), Blanch's letter—

which was drafted by counsel—did not suggest that Blanch was confused about his alleged

entitlement to severance benefits.  Rather, it was a demand letter related to the EEOC process.

And that letter was addressed to Moyer, Chubb's Regional Human Resources Manager, rather

than the Committee that administers Chubb's severance plan, which confirms that the Committee

was under no obligation to furnish such documents.  *See, e.g.*, *McCarthy v. Ameritech Publ'g,

Inc.*, 763 F.3d 469, 485 (6th Cir. 2014) ("[Plaintiff's] failure to direct her requests to the proper

address is fatal to her claims . . . .").

Blanch first asked the Committee for access to plan documents in his second demand

letter, dated October 7, 2013.  (*See* Second Demand Letter.)  And the Committee supplied those

documents in its letter responding to Blanch's request.  (*See* Chubb Acknowledgment Letter.)[11]

Accordingly, the court will grant summary judgment to Chubb on Blanch's claim for statutory

penalties.

### D. Implied Contract

Chubb's motion for summary judgment challenges Blanch's claim for breach of an

implied contract to pay severance pay, arguing that ERISA's preemption provision, 29 U.S.C.

§ 1144(a), precludes that claim.  (*See* Mot. Summ. J. 9.)  Even were it otherwise, Chubb

continues, the severance plan—an express contract—prevents enforcement of any implied

---

[11] Although the Committee may have posted its response slightly more than 30 days after Blanch's request, the court declines, in its discretion, to award any penalties for such a trivial delay, especially where Blanch's request postdated his termination by over two and a half years.

contract concerning the same subject matter.  By failing to respond to either argument in his

opposition or cross-motion, Blanch has abandoned his claim for breach of an implied contract.

*See, e.g.*, *Wood v. Walton*, 855 F. Supp. 2d 494, 505 (D. Md. 2012) (citing *Mentch v. E. Sav.*

*Bank, FSB*, 949 F. Supp. 1236, 1247 (D. Md. 1997)).  Accordingly, the court will grant summary

judgment to Chubb on Blanch's implied contract claim.

## CONCLUSION

For the reasons stated above, the court will grant Blanch's motion for reconsideration of

his MWPCL claims, grant Chubb's motion for summary judgment, and deny Blanch's cross-

motion for summary judgment.  Accordingly, this court's prior order will be vacated to the

extent it granted summary judgment on Blanch's claims for unpaid incentive pay or profit

sharing under the MWPCL.  And judgment will be granted for Chubb on Blanch's claims for

unpaid severance benefits, statutory penalties, and breach of an implied contract.

A separate order follows.


August 28, 2015_____                          _____/s/_____
Date                                          Catherine C. Blake
                                              United States District Judge